UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CHIVA ADAMS, ET AL.,<br>    Plaintiffs | CIVIL ACTION |
| VERSUS | NO. 14-2506 |
| MICHAEL GLASER, ET AL.,<br>    Defendants | SECTION: "E" (4) |

## ORDER AND REASONS

Before the Court is a Motion for Summary Judgment filed by Defendants Alexander Barnes, Zachary Dubourg, Shane Hollis, Vincent Maranti, Ricky Pabst, and Emile Sanchez.[1] Plaintiffs oppose Defendants' motion.[2] The Court has considered the briefs submitted by the parties, the record, and the applicable law. For the reasons stated herein, the motion for summary judgment is **GRANTED**.

## FACTUAL BACKGROUND

### I.  *The Stop*

The facts surrounding the stop and arrest of Joshua Adams, Sr. ("the Decedent") are, for the most part, not in dispute.[3] On January 4, 2014, at approximately 1:50 a.m., Officer Zachary Dubourg ("Dubourg") of the Kenner Police Department initiated a traffic stop on a vehicle driven by the Decedent.[4] Prior to initiating the stop, Dubourg observed that the temporary license plate on Decedent's vehicle was invalid.[5] As a result, Dubourg activated his emergency lights and sirens and ordered the Decedent to stop his

---

[1] R. Doc. 18.
[2] R. Doc. 26.
[3] *See* R. Doc. 18-1 at 1–3; R. Doc. 26-1 at 1–2.
[4] R. Doc. 18-1 at 1, ¶1; R. Doc. 26-1 at 1, ¶1. At the time of the stop, Dubourg was "on duty in uniform and in a marked Kenner police unit." *See* R. Doc. 18-6 at 1 ("Affidavit of Zachary Dubourg").
[5] R. Doc. 18-1 at 2, ¶2; R. Doc. 26-1 at 1, ¶2. Dubourg stated in his affidavit that "[b]ecause the date on the tag exceeded sixty (60) days from January 4, 2014, he suspected the tag was altered." *See* R. Doc. 18-6 at 1 ("Affidavit of Zachary Dubourg").

vehicle.[6] Upon approaching the vehicle, Dubourg was forced to knock on the window "multiple times" to gain the Decedent's attention.[7] Decedent eventually made eye contact with Dubourg but immediately looked away.[8] After Dubourg again knocked, Decedent rolled the window down, at which point Dubourg allegedly detected a "strong odor consistent with burnt marijuana."[9]

Dubourg then ordered the Decedent to exit his vehicle, but Decedent refused to comply.[10] Instead, the Decedent abruptly reached toward the vehicle's center console.[11] Fearing that the Decedent may be reaching for a weapon, Dubourg opened the driver's side door and secured Decedent's left arm.[12] However, Decedent was able to grab a "foreign substance"[13] with his right hand and place it in his mouth.[14] Dubourg then removed the Decedent from the vehicle and brought him down to the ground.[15] Dubourg testified that the Decedent "resisted attempts to handcuff him and refused to expel the unknown object(s) from his mouth."[16] However, Decedent eventually complied and was placed under arrest without further incident.[17]  The Decedent was then placed in a police vehicle and driven to the Kenner jail.[18]

---

[6] R. Doc. 18-1 at 1–2, ¶¶1, 2; R. Doc. 26-1 at 1, ¶¶1, 2.
[7] *See* R. Doc. 18-6 at 1–2 ("Affidavit of Zachary Dubourg").
[8] *See* R. Doc. 18-6 at 2 ("Affidavit of Zachary Dubourg").
[9] *See* R. Doc. 18-6 at 2 ("Affidavit of Zachary Dubourg").
[10] R. Doc. 18-1 at 2, ¶¶4–6; R. Doc. 26-1 at 1–2, ¶¶4–6.
[11] R. Doc. 18-1 at 2, ¶6; R. Doc. 26-1 at 2, ¶6.
[12] R. Doc. 18-1 at 2, ¶7; R. Doc. 26-1 at 2, ¶7.
[13] Plaintiffs identify the substance as a "white object" in their opposition memorandum. *See* R. Doc. 26 at 4.  It is undisputed that Decedent put something in his mouth. R. Doc. 18-1 at 2, ¶8; R. Doc. 26-1 at 2, ¶8.
[14] R. Doc. 18-1 at 2, ¶8; R. Doc. 26-1 at 2, ¶8. During the stop, the Decedent repeatedly denied that he placed anything in his mouth. *See* R. Doc. 18-6 at 2 ("Affidavit of Zachary Dubourg").
[15] R. Doc. 18-1 at 2, ¶¶8, 9; R. Doc. 26-1 at 2, ¶¶8, 9.
[16] R. Doc. 18-6 at 2 ("Affidavit of Zachary Dubourg").
[17] *See* R. Doc. 18-6 at 2 ("Affidavit of Zachary Dubourg").
[18] R. Doc. 18-1 at 3, ¶11; R. Doc. 26-1 at 2, ¶11.

## II. *The Booking*

Some of the facts regarding what occurred after the Decedent arrived at the Kenner jail are in dispute, but no genuinely disputed facts are material to the Court's decision. The parties agree that, upon arriving at the jail, Dubourg informed Officer Alexander Barnes ("Barnes") and Correctional Officer Ricky Pabst ("Pabst") that the Decedent may have ingested narcotics.[19] Accordingly, Dubourg requested that Pabst and Barnes strip search the Decedent, "to determine whether he had contraband on his person."[20]

It is undisputed that Pabst and Barnes gave the Decedent instructions on why the strip search was being performed and how it would be performed.[21] However, the Defendants state that, while advising the Decedent that a "mouth sweep" was required in connection with the strip search, they observed the Decedent make a "big swallow" or "big gulp."[22] Plaintiffs disagree with the contention that the "Decedent took a big gulp as if he was clearing his mouth."[23] Nevertheless, the parties agree that the strip search of Decedent failed to reveal any contraband.[24]

After the strip search had concluded, the Decedent was then returned to his booking cell.[25] The Defendants argue that soon thereafter, while Decedent was in the booking cell and not being recorded on video, Dubourg observed the Decedent make a "chewing motion" and "what appeared to be a white substance on his lips."[26] The

---

[19] R. Doc. 18-1 at 3, ¶12; R. Doc. 26-1 at 2, ¶12.
[20] R. Doc. 18-1 at 3, ¶¶12–14; R. Doc. 26-1 at 2, ¶¶12–14.
[21] R. Doc. 18-1 at 3, ¶14; R. Doc. 26-1 at 2, ¶14.
[22] R. Doc. 18-1 at 3, ¶15; R. Doc. 26-1 at 2, ¶15.
[23] *See* R. Doc. 26-1 at 2, ¶15.
[24] R. Doc. 18-1 at 3, ¶¶16–17; R. Doc. 26-1 at 2, ¶¶16–17.
[25] R. Doc. 18-1 at 3, ¶18; R. Doc. 26-1 at 2, ¶18.
[26] R. Doc. 18-6 at 2–3 ("Affidavit of Zachary Dubourg").

3

Plaintiffs dispute this assertion[27] but fail to present any competent summary judgment evidence to support their version of the events.[28]

The Defendants contend that Dubourg feared the Decedent might be ingesting cocaine, so Dubourg "immediately traveled down to the booking cage where [the Decedent] was located."[29] Lieutenant Emile Sanchez ("Sanchez") and Officers Barnes, Shane Hollis ("Hollis"), and Vincent Miranti ("Miranti") joined Dubourg at Decedent's cell.[30] Dubourg ordered the Decedent to spit out whatever he had in his mouth, but the Decedent did not comply.[31] The Plaintiffs disagree with the contention that the Decedent refused to open his mouth[32] but do not provide any competent summary judgment evidence to support their factual contention. In any event, the parties agree that Dubourg then attempted to remove the Decedent from his cell.[33]

The parties do not dispute that the Decedent resisted being removed from the cell.[34] It is also undisputed that Dubourg consequently pulled the Decedent from his cell and took him down to the ground on his stomach.[35] The parties do dispute, however, the

---

[27] *See* R. Doc. 26-1 at 2, ¶21. Plaintiffs deny the Defendants' assertion that the Decedent was chewing on something while in his cell post-strip search. R. Doc. 26-1 at 2, ¶21.
[28] The Plaintiffs cite "Plaintiffs Exhibits 5 and 6" in support of their contention that the Decedent was not chewing on something at this stage of the encounter. However, the Court fails to see how these exhibits—(1) Dubourg's incident report from the Kenner Police Department, and (2) a Criminal Investigations Division Report—or the information contained therein support Plaintiffs' position. Further, it is questionable whether these exhibits even amount to competent summary judgment evidence.
[29] R. Doc. 18-6 at 3 ("Affidavit of Zachary Dubourg").
[30] *See generally* R. Doc. 18-1 at 4; R. Doc. 26-1 at 2–3.
[31] R. Doc. 18-6 at 3 ("Affidavit of Zachary Dubourg"). The Decedent "refused to open his mouth to allow inspection upon being instructed to do so and refused to expel the contents of his mouth." R. Doc. 18-5 at 7.
[32] *See* R. Doc. 18-1 at 4, ¶25; R. Doc. 26-1 at 3, ¶25.
[33] *See* R. Doc. 18-1 at 4, ¶24.
[34] *See* R. Doc. 18-1 at 4, ¶24; R. Doc. 26-1 at 2, ¶24.
[35] R. Doc. 18-1 at 4, ¶24. According to Plaintiffs, Dubourg, Sanchez, Barnes, and Hollis "rushed" into Decedent's cell and began "attacking" him. *See* R. Doc. 26 at 8. Plaintiffs allege that Dubourg placed his left arm around the Decedent's neck and proceeded to strike the Decedent with his right arm, "forcibly taking him to the ground." R. Doc. 26 at 8. Plaintiffs describe Dubourg's restraint technique as a "choke hold." *See* R. Doc. 26 at 8. The Defendants dispute the Plaintiffs' characterization of the incident. *See* R. Doc. 18-1 at 4–5, ¶¶22–29. Fortunately, there is video evidence of this portion of the event on which the Court relied to determine whether there was a genuine issue of material fact as to what occurred.

4

manner in which Decedent was removed from the cell and whether the Defendants used a "chokehold" technique. According to Plaintiffs, Dubourg, Sanchez, Barnes, and Hollis "rushed" into Decedent's cell and began "attacking" him.[36] Plaintiffs allege that Dubourg placed his left arm around the Decedent's neck and proceeded to strike the Decedent with his right arm, "forcibly taking him to the ground."[37] Plaintiffs describe Dubourg's restraint technique as a "chokehold."[38] The Defendants dispute the Plaintiffs' characterization of the incident.[39]

In any event, the parties do agree that, once the Decedent was on the ground, Sanchez began applying "fingertip pressure points" in an attempt to force the Decedent to open his mouth and prevent him from swallowing.[40] The Defendants state that, once on the ground, the Decedent continued refusing to open his mouth;[41] however, Plaintiffs disagree.[42] The parties agree that Miranti subsequently retrieved a pair of gloves to assist in opening Decedent's mouth.[43] The parties also agree that Miranti then attempted to apply a pressure point behind Decedent's earlobe to no avail.[44] It also is undisputed that Miranti provided handcuffs to Hollis and instructed Hollis to restrain the Decedent.[45]

---

[36] *See* R. Doc. 26 at 8.
[37] R. Doc. 26 at 8.
[38] *See* R. Doc. 26 at 8.
[39] *See* R. Doc. 18-1 at 4–5, ¶¶22–29; *see also* R. Doc. 26-1 at 2–3, ¶¶22–29.
[40] R. Doc. 18-1 at 4, ¶24; R. Doc. 26-1 at 2–3, ¶24.
[41] R. Doc. 18-1 at 4, ¶25; R. Doc. 26-1 at 3, ¶25.
[42] *See* R. Doc. 18-1 at 4, ¶25; R. Doc. 26-1 at 3, ¶25. Plaintiffs cite the video surveillance footage to support their disagreement.
[43] *See* R. Doc. 18-1 at 4–5, ¶¶26–27; R. Doc. 26-1 at 3, ¶¶26–27.
[44] R. Doc. 18-1 at 4–5, ¶27; R. Doc. 26-1 at 3, ¶27.
[45] *See* R. Doc. 18-1 at 5, ¶28; R. Doc. 26-1 at 3, ¶28.

The parties agree that, at some point during this encounter, the officers noticed a "small amount of blood and saliva" coming from Decedent's mouth.[46] It is undisputed that the officers immediately contacted Emergency Medical Services and requested an ambulance.[47] It is also undisputed that, while awaiting the arrival of EMS, the Decedent began "seizing" and "convulsing," which prompted Dubourg to hold Decedent's head to prevent it from hitting the floor.[48] EMS personnel arrived at the Kenner jail facility at approximately 2:43 a.m. and transported the Decedent to East Jefferson General Hospital.[49] Decedent was pronounced dead at 3:43 a.m.[50]

The Defendants assert that at no point during the aforementioned encounter did any of the Defendants employ a "chokehold" on the Decedent, nor did any of the Defendants strike the Decedent about the face, head, or body.[51] The Plaintiffs dispute these assertions, citing the surveillance video from the Kenner jail as evidence.[52] Defendant Hollis also states that the only force he exerted against the Decedent was to hold his wrists down,[53] but the Plaintiffs disagree.[54]

III. *Post-Booking*

After the Decedent departed the jail via ambulance, the Defendants contend they discovered a "small, white rock-like object" on the floor of the Decedent's cell.[55] The

---

[46] *See* R. Doc. 18-1 at 5, ¶29; R. Doc. 26-1 at 3, ¶29. Plaintiffs contend that the "attack" continued until Decedent began to "bleed and convulse." R. Doc. 26 at 9.
[47] R. Doc. 18-1 at 5, ¶31; R. Doc. 26-1 at 3, ¶31.
[48] R. Doc. 18-1 at 5, ¶¶32–33; R. Doc. 26-1 at 3, ¶¶32–33.
[49] R. Doc. 18-1 at 5, ¶34; R. Doc. 26-1 at 3, ¶34.
[50] R. Doc. 18-1 at 5, ¶34; R. Doc. 26-1 at 3, ¶34.
[51] R. Doc. 18-1 at 5–6, ¶35.
[52] R. Doc. 26-1 at 3, ¶35.
[53] *See* R. Doc. 18-1 at 6, ¶38.
[54] *See* R. Doc. 18-1 at 6, ¶38; R. Doc. 26-1 at 3, ¶38.
[55] R. Doc. 18-1 at 6, ¶41.

6

Plaintiffs disagree. [56] Instead, the Plaintiffs suggest that the Defendants' alleged discovery of this "object" in the Decedent's cell is a "fabrication."[57]

   IV.   *The Autopsy*

Dr. Susan Garcia, a pathologist at the Jefferson Parish Forensic Center, performed an autopsy on the Decedent on January 6, 2014.[58] Dr. Garcia determined Decedent's cause of death to be "acute cocaine intoxication."[59] Significantly, Dr. Garcia concluded that there was "no physical evidence of injury" to indicate that "use of force, if any at all, by law enforcement" contributed to Decedent's death.[60] Further, Dr. Garcia testified in her deposition that any force exerted against Decedent by law enforcement "did not contribute to his death."[61] Dr. Garcia did note that the Decedent's toxicology results included positive findings for "cocaine, its metabolite benzolyecgonine, and marijuana."[62] And the "buccal swab" and "nasal swab" were both positive for cocaine as well, consistent with the Decedent having "orally ingested" the narcotic.[63]

The Defendants rely extensively on Dr. Garcia's autopsy report in their motion for summary judgment.[64] The Plaintiffs contest the findings of the report, suggesting that Dr. Garcia reached her conclusion without the benefit of viewing the video footage described above.[65] The Plaintiffs also dispute the opinions expressed by Dr. Garcia in

---

[56] R. Doc. 26-1 at 4, ¶41. Plaintiffs cite an affidavit executed by Defendant Sanchez, which omits reference of this discovery. Plaintiffs seem to rely on Defendant Sanchez's affidavit for its lack of reference to the discovery of this object. In any event, this issue is not material to the Court's decision.
[57] *See* R. Doc. 26 at 18. Plaintiffs cite the surveillance video from the Kenner jail as support, asserting that the video proves the Decedent was never in the area where the drugs were discovered. *See* R. Doc. 26 at 18.
[58] R. Doc. 18-1 at 6, ¶43. *See also* R. Doc. 18-7 at 6:11–13 ("Deposition of Susan M. Garcia, M.D.").
[59] R. Doc. 18-1 at 7, ¶45. *See also* R. Doc. 18-7 at 16:4–7 ("Deposition of Susan M. Garcia, M.D.").
[60] R. Doc. 18-1 at 7–8, ¶46. R. Doc. 18-7 at 25:2–4 ("Deposition of Susan M. Garcia, M.D.").
[61] R. Doc. 18-7 at 25:2–4 ("Deposition of Susan M. Garcia, M.D.").
[62] R. Doc. 18-1 at 8, ¶47. *See also* R. Doc. 18-7 at 14, 15 ("Deposition of Susan M. Garcia, M.D.").
[63] R. Doc. 18-1 at 8, ¶47. *See also* R. Doc. 18-7 at 14, 15 ("Deposition of Susan M. Garcia, M.D.").
[64] *See.* R. Doc. 18-5 at 8–9.
[65] *See* R. Doc. 26-1 at 4, ¶48.

her deposition, during which she concluded that any force exerted by the Defendants did not cause or contribute to the Decedent's death.[66] The Plaintiffs offered no expert testimony to question or refute those opinions expressed by Dr. Garcia.

V.   *The Surveillance Video*

Both the Plaintiffs and the Defendants rely heavily on the surveillance video from the Kenner jail to support their respective positions.[67] The parties differ as to the proper interpretation of the events depicted on the video. Defendants argue that the video proves they acted reasonably under the circumstances and did not exert excessive force against the Decedent. The Plaintiffs argue, on the other hand, that the video depicts the Defendants "attack" on the Decedent, an encounter during which the Defendants used a "chokehold" procedure and employed force that was "clearly excessive."[68]

## **PROCEDURAL HISTORY**

On October 30, 2014, Plaintiffs[69] filed suit against the Defendants in their individual and official capacities under 42 U.S.C. § 1983 for violations of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.[70] Plaintiffs also allege violations of Louisiana Civil Code articles 2315, 2315.1, 2315.2, and 2316.[71] Specifically, Plaintiffs argue that the Defendants[72] should be found liable for, *inter alia*,

---

[66] *See generally* R. Doc. 18-7; *see also* R. Doc. 18-1 at 7–8, ¶46.
[67] *See generally* R. Doc. 18-5 at 10; R. Doc. 18-9 ("Exhibit 4"); R. Doc. 26.
[68] R. Doc. 26 at 8–9, 20.
[69] The Plaintiffs in the present action are: (1) The Estate of Joshua Adams, Sr.; and (2) Chiva Adams, individually and on behalf of her minor children J.A. and J.A., Jr.
[70] *See* R. Doc. 1 at 7, ¶21.
[71] *See* R. Doc. 1 at 7, ¶22.
[72] The following individuals were originally named as defendants in both their official and individual capacities: (1) Chief of Police Michael Glaser; (2) Lieutenant Emile Sanchez; (3) Officers Zachary Dubourg, Vincent Miranti, and Alexander Barnes; (4) Corrections Officers Shane Hollis and Ricky Pabst; and (5) an unnamed defendant.

"striking and choking decedent, and using excessive force, far in excess of that required under the circumstances, which resulted in [Decedent's] needless and untimely death."[73]

On August 27, 2015, Defendants filed the present motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[74] In the motion, Defendants assert the defense of qualified immunity to Plaintiffs' federal claims against them in their individual capacities,[75] and Defendants argue that Plaintiffs' state law claims fail as a matter of law for the same reasons they are entitled to qualified immunity.[76] Defendants also contend that Plaintiffs' federal claims against them in their official capacities should be dismissed with prejudice.[77]

## **LEGAL STANDARD**

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[78] "An issue is material if its resolution could affect the outcome of the action."[79] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[80] All reasonable inferences are drawn in favor of the non-moving party.[81] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could

---

[73] R. Doc. 1 at 7, ¶21.
[74] R. Doc. 18.
[75] R. Doc. 18-5 at 12.
[76] R. Doc. 18-5 at 23–24.
[77] R. Doc. 18-5 at 24.
[78] Fed. R. Civ. P. 56. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[79] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[80] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[81] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[82]

If the dispositive issue is one on which the moving party will bear the burden of persuasion at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[83] If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[84]

If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, as in this case, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) affirmatively demonstrating that there is no evidence in the record to establish an essential element of the non-movant's claim.[85] If the movant fails to affirmatively show the absence of evidence in the record, its motion for summary judgment must be denied.[86] Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party." [87]

---

[82] *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).
[83] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).
[84] *Celotex*, 477 U.S. at 322–24.
[85] *Id.* at 331–32 (Brennan, J., dissenting).
[86] *See id.* at 332.
[87] *Id.* at 332–33. The burden would then shift back to the movant to demonstrate the inadequacy of the evidence relied upon by the non-movant. Once attacked, "the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e),

"[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[88]

## DISCUSSION

In the present motion for summary judgment, the Defendants (1) assert the defense of qualified immunity to Plaintiffs' federal claims against them in their individual capacities; (2) contend that Plaintiffs' claims against them in their official capacities are not cognizable as a matter of law; and (3) argue that Plaintiffs' state-law claims should be dismissed with prejudice.[89] The Court will address each of these arguments in turn.

I.  *INDIVIDUAL CAPACITY – QUALIFIED IMMUNITY*

"Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right."[90] As explained by the United States Supreme Court, "qualified immunity seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability."[91] In essence, qualified immunity "avoid[s] excessive disruption of government" by permitting officials to exercise their vested discretion without fear of civil liability."[92]

---

or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Id.* at 332–33, 333 n.3.

[88] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

[89] R. Doc. 18 at 1.

[90] *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). *See also Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[91] *United States v. Lanier*, 520 U.S. 259, 570 (1997) (internal quotation marks and citations omitted).

[92] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Although qualified immunity is nominally an affirmative defense, "the plaintiff has the burden to negate the defense once properly raised."[93]

> The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.[94]

In this case, because the Defendants have properly invoked the doctrine of qualified immunity,[95] the burden has shifted to Plaintiffs to show that the Defendants are not immune from suit in their individual capacities. In resolving questions of qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry.[96] First, the court must determine whether the plaintiff has "adduced sufficient evidence to raise a genuine issue of material fact" suggesting the defendants violated an actual constitutional right.[97] If the answer is "no," then the analysis ends.[98] If the answer is "yes," however, the court must determine whether the right at issue was "clearly established" at the time of the defendants' alleged misconduct.[99] This standard, even on summary judgment, "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."[100]

---

[93] *Brumfield*, 551 F.3d at 326. *See also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).
[94] *Id.* (quoting *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 866, 872 (5th Cir. 1997) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.")).
[95] *See* R. Doc. 18.
[96] *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014).
[97] *Brumfield*, 551 F.3d at 326 (citing *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)).
[98] *Id.* (citing *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007)).
[99] *See id.*; *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (citing *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011); *Pearson*, 555 U.S. at 230–33).
[100] *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citing *Brumfield*, 551 F.3d at 326). *See also Malley v. Briggs*, 475 U.S. 335, 343 (1986); *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

      a.    *Violation of a Constitutional Right*

The Court will first address whether the Plaintiffs have "adduced sufficient evidence" to raise a genuine issue of material fact suggesting the Defendants violated a constitutional right. In this case, the Plaintiffs allege claims of excessive force against the Defendants.[101]

      i.    Excessive Force Standard

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures."[102] The inquiry into whether this right was violated requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[103] Excessive force claims are necessarily fact-intensive; whether the force used is "excessive" or "unreasonable" depends on "the facts and circumstances of each particular case."[104] The reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[105]

To prevail on their excessive force claims at trial, Plaintiffs would be required to establish that the Decedent suffered: "(1) an injury; (2) which resulted directly and only from a use of force that was clearly excessive; and (3) the excessiveness of which was clearly unreasonable."[106] However, at the summary judgment stage, Plaintiffs must merely point to facts and evidence that, when considered in the light most favorable to

---

[101] *See* R. Doc. 1.
[102] *Tolan*, 134 S. Ct. at 1865 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).
[103] *Id.* at 1865–66 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *Graham*, 490 U.S. at 396).
[104] *Deville*, 567 F.3d at 167 (quoting *Graham*, 490 U.S. at 396; *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004)).
[105] *Graham*, 490 U.S. at 396–97. *See also Poole*, 691 F.3d at 628; *Ontiveros v. City of Rosenberg*, 564 F.3d 371, 382 (5th Cir. 2009).
[106] *Ontiveros*, 564 F.3d at 382. *See also Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam).

them, raise a genuine dispute as to whether the Decedent was the victim of excessive force.[107] If Plaintiffs fail to carry this burden, summary judgment must be granted.[108]

### ii. Was Force Excessive and Clearly Unreasonable?

The Plaintiffs claim there is a genuine issue of material fact as to whether the Defendants' actions in this case amount to an excessive and clearly unreasonable use of force.[109] As the Defendants pleaded the defense of qualified immunity in good faith, the burden has been shifted to the Plaintiffs to direct the Court's attention to competent summary judgment evidence sufficient to establish that a genuine issue of material fact does indeed exist. The evidence cited by the Plaintiffs—(1) Dr. Garcia's autopsy report; (2) Dr. Garcia's deposition testimony; and (3) the Kenner Police Department video—plainly does not set forth sufficient facts to establish that a genuine issue of material fact exists.

The Plaintiffs rely mainly on the video from the Kenner jail to raise a genuine issue of material fact as to whether the Defendants used excessive force against the Decedent.[110] The video does confirm that the Defendants removed Decedent from the cell and placed him face down on the jail-house floor, but it does not reveal him being "forcibly thrown to the ground" or the use of other excessive force during this procedure. Plaintiffs contend Decedent was placed in a chokehold and struck several times by the Defendants, but the video does not depict such conduct. The video does show the Defendants taking the Decedent to the ground, trying to get an object out of Decedent's mouth, and holding the Decedent down during his seizure. However, there is no

---

[107] *See Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013); *Spann v. Rainey*, 987 F.2d 1110, 1115 (5th Cir. 1993).
[108] *See generally Spann*, 987 F.2d at 1115; *Poole*, 691 F.3d at 628.
[109] *See* R. Doc. 26 at 17.
[110] *See* R. Doc. 26 at 17.

evidence that the Defendants struck the Decedent or used a "chokehold" technique during the encounter.

Whether force is excessive depends on the circumstances of each particular case and must be judged from the perspective of a reasonable officer.[111] In this case, the Defendants argue that the unrefuted evidence shows: (1) Decedent was seen placing a "foreign substance" in his mouth during the initial arrest, (2) Decedent took a "big gulp" after being questioned about what was in his mouth, (3) Decedent was seen chewing on something in his cell, and (4) Decedent had white powder on his lips when approached by the Defendants.[112] The Defendants produced competent summary judgment evidence to support their arguments.[113] The Plaintiffs argue that these facts are in dispute but fail to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact exists. The Plaintiffs unsubstantiated assertions are not competent summary judgment evidence. The Court finds that the facts listed above are not in dispute.

Under these facts, a reasonable officer could conclude that Decedent was ingesting cocaine. The Decedent clearly refused to obey the Defendants' lawful commands to expel the objects in his mouth, prompting the Defendants to react for the

---

[111] *See Graham*, 490 U.S. at 396–97; *see also Poole*, 691 F.3d at 628; *Ontiveros*, 564 F.3d at 382.
[112] *See supra* Factual Background, Part I–II.
[113] The Defendants' summary judgment evidence is convincing. First, Defendants rely on the affidavit of Zachary Dubourg, the Kenner Police Department officer who arrested the Decedent, to support the fact that Decedent was seen placing a foreign substance in his mouth during the initial arrest. *See* R. Doc. 18-6 at 2 ("Affidavit of Zachary Dubourg"). Second, the Defendants in their statement of uncontested facts note that Officers Hollis and Pabst observed Decedent make a "big swallow" or "big gulp" after being notified that his mouth would be searched for contraband. R. Doc. 18-1 at 3, ¶15. Third, Officer Dubourg's affidavit also supports the Defendants' assertion that the Decedent was seen chewing on something in his cell, and that a white substance was observed on Decedent's lips. R. Doc. 18-6 at 2–3 ("Affidavit of Zachary Dubourg"). This assertion is also supported by the Defendants' statement of uncontested material facts. *See* R. Doc. 18-1 at 4, ¶¶20–21. Further, the Defendants rely on the video evidence from the Kenner jail, as well as the deposition of Dr. Susan Garcia, in support of their arguments that any force exerted was not excessive. The Court finds that the evidence relied upon by the Defendants is competent and worthy of consideration at this summary judgment stage.

Decedent's safety and for the preservation of evidence. The Defendants' use of force was an objectively reasonable attempt to cause Decedent to expel the objects in his mouth. The fact that cocaine was detected in Decedent's system during his autopsy supports the contention that he was, in fact, ingesting the drug during his encounter with Defendants.

The Plaintiffs also point to Dr. Garcia's autopsy report and her deposition testimony in an attempt to identify a genuine issue of material fact. Dr. Garcia conducted the only autopsy on the Decedent, determining his cause of death to be "acute cocaine intoxication." Dr. Garcia's autopsy failed to reveal any evidence that Decedent suffered injuries, whether external or internal, indicative of a violent struggle or being violently thrown to the ground.[114] The Plaintiffs do not dispute that Dr. Garcia reached these conclusions based on the autopsy,[115] but do attempt to discredit the value and significance of Dr. Garcia's autopsy. Specifically, Plaintiffs suggest Dr. Garcia's conclusions would have been different had she viewed the surveillance video of the incident prior to performing the autopsy.[116] The Court notes that Dr. Garcia did view the

---

[114] *See generally* R. Doc. 18-8. In fact, the only external manifestation of an injury that Dr. Garcia discovered was a 1" abrasion on the top back of Decedent's left shoulder. *See* R. Doc. 18-8 at 3. Throughout her deposition, Dr. Garcia confirmed that: (1) Decedent's "corneas were clear and there was no petechiae present;" (2) an examination of Decedent's neck revealed his "hyoid" and "larynx" intact, which contradicts the claims of a "chokehold;" (3) an examination of Decedent's brain failed to reveal any lesions or internal bleeding; (4) an extensive dissection of the subcutaneous tissue of the back, buttock, and lower and upper extremities revealed only the 1" abrasion on Decedent's left shoulder, which was characterized by Dr. Garcia as an "extremely minor insignificant injury;" (5) there was no physical evidence of injury suggesting that Decedent was "violently slammed to the floor;" (6) there was no physical evidence of injury suggesting that Decedent was forced into a "chokehold;" (7) there was no evidence of injury to suggest that Decedent was struck on the right side of his head; (8) there was no evidence of injury to suggest that Decedent was struck on the head or face whatsoever; (9) there was no evidence on autopsy that a taser device was employed on the Decedent; (10) there was no physical evidence of injury suggesting that Decedent was struck on the left side of his body; and importantly (11) there was no evidence that any use of force by the Defendants contributed to the Decedent's death. *See generally* R. Doc. 18-7 ("Deposition of Susan M. Garcia, M.D.").
[115] *See* R. Doc. 18-1 at 7, ¶45; R. Doc. 26-1 at 4, ¶45.
[116] R. Doc. 26 at 16.

16

video subsequent to the autopsy, during her deposition.[117] Even after viewing the video, Dr. Garcia maintained that the Decedent's "incident" with the Defendants "did not contribute to his death."[118] Moreover, Dr. Garcia testified at her deposition that there was no "physical manifestation of any injury to corroborate any force in the nature of this incident."[119] Plaintiffs have introduced no expert or other testimony to contradict the results of Dr. Garcia's autopsy or her deposition testimony. Their unsupported allegations are not sufficient to create a genuine issue of material fact.

Accordingly, the Plaintiffs have not produced sufficient evidence that, when viewed in the light most favorable to them, raises any genuine issue of material fact as to whether the Defendants used excessive and unreasonable force on the Decedent. Instead, after reviewing the evidence submitted, most persuasively the video, the Court finds the Defendants' conduct in connection with the Decedent was objectively reasonable and not an excessive use of force. The Court finds that no reasonable trier of fact could, after considering the evidence, arrive at a contrary conclusion.

Because there was no violation of the Decedent's constitutional rights, *i.e.*, Decedent's Fourth Amendment right to be free from excessive force, Plaintiffs are unable to satisfy the first requirement of the qualified-immunity inquiry, and the analysis on their Section 1983 claim consequently ends.[120] Defendants are entitled to summary judgment on Plaintiffs' Section 1983 claims against them in their individual capacities.

---

[117] R. Doc. 18-7 at 22–26 ("Deposition of Susan M. Garcia, M.D.").
[118] R. Doc. 18-7 at 22–26 ("Deposition of Susan M. Garcia, M.D.").
[119] R. Doc. 18-7 at 22–24 ("Deposition of Susan M. Garcia, M.D.").
[120] *See* discussion *supra* Part I.

II.   *OFFICIAL CAPACITY*

Plaintiffs have also sued the Defendants in their official capacities as police officers for the City of Kenner.[121] In their motion for summary judgment, Defendants note that "bringing claims against individual defendants in their official capacities is simply another way to plead a cause of action against the entity of which the individuals are agents."[122] Defendants argue that, "[b]ecause none of the individual officers are liable, however, neither is the City of Kenner as their employer."[123] In their opposition, Plaintiffs fail to respond to this argument.

It is well accepted that claims against police officers in their official capacities are treated as claims against the municipality that the officers serve.[124] That is, in an official-capacity suit, the real party in interest is the municipality not the named official.[125] To establish the liability of a municipality, the plaintiff must "demonstrate a policy or custom which caused the alleged constitutional deprivation."[126] The plaintiff must show that such a policy was the "moving force" behind the constitutional violation at issue and that the custom or policy was the "cause in fact" of the deprivation of rights.[127] Moreover, "[t]he description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts."[128]

---

[121] *See* R. Doc. 1 at 2–3.
[122] R. Doc. 18-5 at 24.
[123] R. Doc. 18-5 at 24.
[124] *Brooks v. George Cnty.*, 84 F.3d 157, 165 (5th Cir. 1996). *See also Hafer v. Melo*, 502 U.S. 21, 25 (1992); *Smith v. Harrison Cnty.*, No. 1:07cv1256-LG-JMR, 2010 WL 4105674, at *2 (S.D. Miss. Sept. 27, 2010).
[125] *See Hafer*, 502 U.S. at 36.
[126] *Brooks*, 84 F.3d at 165. *See also Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 690–91 (1978).
[127] *See Batiste v. Theriot*, 458 F. App'x 351, 358 (5th Cir. 2012); *see also Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).
[128] *Id.* (citing *Fraire*, 957 F.2d at 1277).

It is undisputed that the Plaintiffs asserted only that the Kenner Police Chief, Michael Glaser, maintained a "custom, policy, practice, and procedure of negligently and inadequately hiring, training, supervising and retaining police/corrections officers,"[129] and that Glaser was dismissed as a Defendant in July 2015, because he had not yet been elected to his position at the time of the incident with Decedent. [130] It is also undisputed that Glaser was not personally involved in what transpired.[131] Because Glaser had not yet taken office, he could not have maintained such a policy or custom. The Court further notes that there are no other allegations of an unconstitutional policy or custom maintained by the Kenner Police Department. Accordingly, Defendants are entitled to summary judgment on the claims against them in their official capacities.[132]

III.     *STATE LAW CLAIMS*

Plaintiffs have also alleged violations of various Louisiana Civil Code provisions, namely articles 2315, 2315.1, 2315.2, 2316, and 2320. Plaintiffs contend that the Defendants are liable under those articles for "violently striking and choking decedent, and using excessive force, far in excess of that required under the circumstances, which

---

[129] R. Doc. 1 at 8.
[130] *See* R. Docs. 12, 13.
[131] *See* R. Docs. 12, 13.
[132] To the extent that the Plaintiffs argue the City of Kenner should be liable for the actions of the Defendants under the theory of vicarious liability (*See* R. Doc. 1 at 9, ¶24f), the Court notes that a municipality cannot be held vicariously liable under Section 1983. *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 694). Rather, a "municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). It is only when the "execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694. Further, to the extent the Plaintiffs argue that Chief Michael Glaser is liable under a vicarious liability theory (*See* R. Doc. 1 at 9, ¶24f), the Court reaffirms that Glaser has been dismissed as a Defendant and thus cannot be found liable under such a theory. Plaintiffs also state in their initial complaint that Defendant Sanchez "[f]ailed to train, supervise and discipline" the other Defendants, which led to the "violent striking, tasing, take down . . . and use of excessive force" on the Decedent. *See* R. Doc. 1 at 9, ¶25a. However, Plaintiffs have failed to allege a cause of action on this theory, and Plaintiffs do not offer any facts or evidence suggesting that Defendant Sanchez could be found liable under a failure-to-train theory.

lead to, contributed to and/or resulted in the untimely and needless death of decedent."[133]

Excessive-force claims under Louisiana law are analyzed with the same standard that is used to gauge excessive force claims under Section 1983.[134] That is, as in the qualified immunity context, the actions of the Defendants, when considered under state law, must be judged for objective reasonableness. The Defendants did not use excessive force and therefore acted in an objectively reasonable manner and are entitled to qualified immunity from Plaintiffs' federal claims against them in their individual capacities. For the same reasons, the Plaintiffs' state law claims are without merit and must be dismissed.

## CONCLUSION

**IT IS ORDERED** that the motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims are hereby **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 5th day of October, 2015.

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[133] R. Doc. 1 at 7.
[134] *See Kyle v. City of New Orleans*, 353 So. 2d 969, 972–73 (La. 1977) ("The use of force by law enforcement must be tested by the 'reasonable force' standard."); *Deville*, 567 F.3d at 172–73 ("Louisiana's excessive force tort mirrors its federal constitutional counterpart. 'The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result.'"); *Winston v. City of Shreveport*, 390 F. App'x 379, 385–86 (5th Cir. 2010) ("Under Louisiana law, we apply the same 'reasonableness' standard to Winston's state law claims of false arrest and excessive force that we apply when analyzing whether qualified immunity shield Officer Willis against Winston's federal constitutional claims.").